UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS HUNTER,<br><br>       Plaintiff,<br><br>    v.<br><br>TBDC, LLC,<br><br>       Defendant.<br>_____/ | No. C-08-4158 EMC<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO SET ASIDE ENTRY OF DEFAULT; AND DENYING AS MOOT PLAINTIFF'S APPLICATION FOR DEFAULT JUDGMENT**<br><br>**(Docket Nos. 10, 23)** |

       Plaintiff Dennis Hunter initiated this lawsuit on September 2, 2008. *See* Docket No. 1 (complaint). Default was entered against Defendant TBDC, LLC on October 10, 2008. *See* Docket No. 9. After Mr. Hunter filed a motion for default judgment, TBDC made an appearance. Currently pending are Mr. Hunter's motion for default judgment and Defendant TBDC, LLC's motion to set aside the entry of default. Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** TBDC's motion to set aside the entry of default and **DENIES** as moot Mr. Hunter's motion for default judgment.

## I.   FACTUAL & PROCEDURAL BACKGROUND

       TBDC is a company that manufactures and sells "tire balls." *See* Compl. ¶ 2; Patricia Summers Decl. ¶ 4. Three people own the company: Patricia Summers, Wade Summers, and Jan Peterson. *See* Summers Decl. ¶ 5. Patricia Summers and Wade Summers are married. Patricia Summers has been TBDC's president since January 2005. *See* Summers Decl. ¶ 2. Previously, Wade Summers had been the president. *See* Summers Decl. ¶ 2.

1  In September 2004, Mr. Hunter and TBDC entered into a nondisclosure agreement. *See*
2  Patricia Summers Decl., Ex. 1. Subsequently, in May 2005, TBDC entered into a development
3  agreement with Hunter Motorsports, Inc. ("HMS"), a company affiliated with Mr. Hunter. *See*
4  Patricia Summers Decl., Ex. 2 (hereinafter "Development Agreement"). Pursuant to that contract,
5  TBDC agreed to "develop Tire Balls for the HMS/Millen off-road car currently under development
6  at Rod Millen Motorsports in Tustin, CA and for other Class 10 off-road cars owned and raced by
7  HMS." Development Agreement ¶ 1. Patricia Summers signed the agreement on behalf of TBDC,
8  and Mr. Hunter signed on behalf of HMS.

9  The dispute that gave rise to this lawsuit took place some six months after TBDC and HMS
10 signed the contract described above.

11 According to Mr. Hunter, in February 2006, he lent $100,000 to TBDC. *See* Hunter Decl. ¶
12 2. TBDC, acting through its representative Wade Summers, asked for the loan. *See* Hunter Decl. ¶
13 2. Mr. Hunter actually made out the $100,000 check to Wade Summers individually "but it was
14 understood that the money was lent to TBDC and not to Wade Summers, individually." Hunter
15 Decl. ¶ 3. "The money was either to be used as a credit against an eventual purchase of TBDC, or
16 repaid upon Hunter's demand." Compl. ¶ 5. Notably, one of TBDC's own financial statements
17 reflected that Mr. Hunter had extended to it -- and not Wade Summers -- a loan of $100,000. *See*
18 Hartley Reply Decl., Ex. C (financial statement) (reflecting note payable to Mr. Hunter in the
19 amount of $100,000). In April 2007, Mr. Hunter asked for the money to be repaid "after
20 negotiations related to a potential investment in the company fell through." Hunter Decl. ¶ 3. A total
21 of $83,000 in principal is still owing. *See* Hunter Decl. ¶ 5.

22 According to TBDC, Mr. Hunter never extended to it a $100,000 loan. *See* Patricia
23 Summers Decl. ¶ 9. Patricia Summers, TBDC's president, claims that

> [i]t was my understanding from statements Wade made to me at this time that Mr. Hunter had sent this money to Wade to assist the TBDC business, and perhaps to induce us to allow Mr. Hunter to become an investor in TBDC at some time. I do not know if this is true. However, I had expressed to Wade and from his comments to me I believe he knew in February 2006 that I was opposed as President to having the company assume any additional debt.

2

Patricia Summers Decl. ¶ 10. Patricia Summers admits that Wade Summers ultimately deposited the $100,000 into an account for the benefit of TBDC; however, that did not make the money a loan from Mr. Hunter. *See* Patricia Summers Decl. ¶ 11. She notes that

> [t]he $100,000 amount was not listed in the year-end books and records of TBDC as a liability of the company to Mr. Hunter. On the contrary, the money was listed as "WSummers Note" for our state and federal tax records, and Wade, I and TBDC's treasurer [and co-owner] Mr. Peterson later signed documents accepting the amount as simply a loan from Wade to the company.

Patricia Summers Decl. ¶ 11.

TBDC disputes that Mr. Hunter ever made a demand for repayment of the $100,000 (*i.e.*, prior to filing this lawsuit). *See* Patricia Summers Decl. ¶ 12. According to the company, Patricia Summers and Wade Summers decided that "it would be prudent to begin repaying Mr. Hunter" in 2007 after negotiations about a possible investment in TBDC or purchase of an interest in the company fell through. Patricia Summers Decl. ¶¶ 13-14. Wade Summers therefore made two payments to Mr. Hunter, totaling $17,000 -- notably from his own bank account, and not TBDC's. *See* Patricia Summers Decl. ¶ 14.

TBDC claims that, after those payments were made, Mr. Hunter and TBDC tried again to see if they could reach a deal about a possible investment or purchase of an interest. *See* Patricia Summers Decl. ¶ 15. In June 2008, Mr. Hunter indicated through a representative that no deal would take place. *See* Patricia Summers Decl. ¶ 15.

In September 2008, Mr. Hunter initiated this action against TBDC. *See* Docket No. 1 (complaint). The record reflects that, upon receiving a copy of the summons and complaint, Ms. Summers sent the information to Mr. Peterson (TBDC's treasurer and co-owner), who then forwarded the documents to an attorney, Robert Frey. *See* Patricia Summers Decl. ¶ 16. Mr. Frey appears to have contacted Mr. Hunter or his counsel to obtain a copy of the proof of service for the summons and complaint as Ms. Summers had concern as to whether service was proper. Mr. Frey also appears to have told Mr. Hunter or his counsel that TBDC was willing to pay at least $83,000 to resolve the case. *See* Simon Reply Decl., Ex. A (e-mails, dated 9/22/08 and 9/23/08). Thus, from the outset, TBDC was trying to settle the case. At one point, Mr. Frey sought an extension to answer

the complaint. Mr. Hunter refused. In spite of TBDC's interest in settling the case, Mr. Hunter chose to seek entry of default. Indeed, he chose to do so when it had been only two weeks since the date that the answer was due. *See* Docket No. 6. Default was entered just a few days later, *see* Docket No. 9, and, then, after only a week or so had lapsed, Mr. Hunter chose to file a motion for default judgment.

## II.    DISCUSSION

### A.    Legal Standard

In the instant case, default has been entered against TBDC, but there is no default judgment as of yet. Mr. Hunter is moving now for default judgment; TBDC opposes the motion and also asks that the Court set aside the entry of default. The Court agrees with TBDC that the first issue for the Court is whether the entry of default should be set aside. If so, this would moot out Mr. Hunter's motion for default judgment.

Under Federal Rule of Civil Procedure 55(c), a "court may set aside an entry of default for good cause." Fed. R. Civ. P. 55(c). Under Ninth Circuit case law, a court considers three factors in determining whether there is good cause: (1) whether the defendant engaged in culpable conduct that led to the default; (2) whether the defendant had a meritorious defense; or (3) whether reopening the default judgment would prejudice the plaintiff. *See Franchise Holding II, LLC. v. Huntington Rest.'s Group, Inc.*, 375 F.3d 922, 925-26 (9th Cir. 2004). A court may set aside a default if *any* of the three factors are true. *See id.* at 926 (emphasizing that the factors are disjunctive). The defendant bears the burden of showing that any of the factors favors setting aside the default. *See id.* Underlying the above analysis is the fact that there is a strong public policy in favor of resolving a case on its merits. *See Pena v. Seguros La Comercial, S.A.*, 770 F.2d 811, 814 (9th Cir. 1985) (noting that default judgments are generally disfavored so that, "[w]henever it is reasonably possible, cases should be decided upon their merits").

### B.    Culpable Conduct

With respect to the first factor, the Ninth Circuit has emphasized that a defendant's conduct is culpable, as opposed to excusable, only where is an intentional failure to answer. *See TCI Group Life Ins. Plan v. Knoebber*, 244 F.3d 691, 697 (9th Cir. 2001).

4

> "Intentional" in many legal contexts means an act or omission taken by an actor knowing what the likely consequence will be. So one might think, reading this standard out of context, that a litigant who receives a pleading, reads and understands it, and takes no steps to meet the deadline for filing a responsive pleading acted intentionally in failing to answer, without more, and therefore cannot meet the culpability standard.
>
> . . . .
>
> Our cases, however, have not used the term "intentional" in [the usual] sense [*i.e.*, resulting from a conscious choice]. Instead, what we have meant is something more like, in the words of a recent Second Circuit opinion addressing the same issue, "willful, deliberate, or evidence of bad faith." Neglectful failure to answer as to which the defendant offers a credible, good faith explanation negating any intention to take advantage of the opposing party, interfere with judicial decisionmaking, or otherwise manipulate the legal process is not "intentional" under our default cases, and is therefore not *necessarily* -- although it certainly may be, once the equitable factors are considered -- culpable or inexcusable.

*Id.* at 697-98 (emphasis in original). The Ninth Circuit has "typically held that a defendant's conduct was culpable . . . where there is *no* explanation of the default inconsistent with a devious, deliberate, willful, or bad faith failure to respond." *Id.* at 698 (emphasis added).

In the instant case, TBDC has adequately met its burden of showing that it did not engage in culpable conduct. There is nothing to suggest that TBDC's admittedly conscious decision not to answer to the complaint was "designed to obtain strategic advantage in the litigation." *Id.* Rather, TBDC's nonappearance appears to have been a result of trying to settle the case without having to engage in litigation. No doubt TBDC's decision to do so entailed a fair amount of risk, but again there is nothing to show that TBDC was trying to "manipulate the legal system" to its advantage. *Id.* at 699.

C.      <u>Meritorious Defense</u>

As to the second factor, most courts have indicated that the issue here is "not whether there is a likelihood that the defaulting party will prevail on the defense, but rather whether a defense is proposed that is legally cognizable and, if proved at trial, would constitute a complete defense to the claims." 55 Moore's Fed. Prac. -- Civ. § 55.70[2][d]. *See, e.g.*, *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 98 (2d Cir. 1993) ("The test of such a defense is measured not by whether there is a likelihood that it will carry the day, but whether the evidence submitted, if proven at trial, would

constitute a complete defense."); *Berthelsen v. Kane*, 907 F.2d 617, 621-22 (6th Cir. 1990) ("Resolving the ambiguous evidence in favor of the defendant, he has stated a meritorious defense. Likelihood of success on the merits is not the measure of whether the defendant presents a meritorious defense. If he 'states a defense good at law, then a meritorious defense has been advanced.'"); *Coon v. Grenier*, 867 F.2d 73, 77 (1st Cir. 1989) ("The 'meritorious defense' component of the test for setting aside a default does not go so far as to require that the movant demonstrate a likelihood of success on the merits. Rather, a party's averments need only plausibly suggest the existence of facts which, if proven at trial, would constitute a cognizable defense."); *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 195 (3d Cir. 1984) ("The showing of a meritorious defense is accomplished when 'allegations of defendant's answer, if established on trial, would constitute a complete defense to the action.'").

Given this standard, this factor weighs in TBDC's favor. TBDC has proffered evidence that the loan made by Mr. Hunter was to Wade Summers, and not to TBDC itself. The check written by Mr. Hunter, by itself, supports TBDC's position. For whatever reason, Mr. Hunter made the check out to Wade Summers, although he easily could have made the check out to TBDC instead. If the loan were in fact made to Wade Summers, and not to TBDC, then TBDC would have a complete defense to the action.

This is not to say that there is not any evidence in Mr. Hunter's favor. As noted above, it appears that one of TBDC's own financial statements reflects that Mr. Hunter had given it a note in the amount of $100,000. *See* Hartley Decl., Ex. C (financial statement). However, as indicated above, the standard is not whether TBDC will likely prevail on its defense.

D.  <u>Prejudice to Plaintiff</u>

As for the third factor, *i.e.*, prejudice to the plaintiff, the Ninth Circuit has stated that "the setting aside of a judgment must result in greater harm than simply delaying resolution of the case. Rather, 'the standard is whether [plaintiff's] ability to pursue his claim will be hindered'" -- *e.g.*, "'the delay must result in tangible harm such as loss of evidence, increased difficulties of discovery, or greater opportunity for fraud or collusion.'" *Id.* at 701. The court explained:

6

> It should be obvious why merely being forced to litigate on the merits cannot be considered prejudicial for purposes of lifting a default judgment. For had there been no default, the plaintiff would of course have had to litigate the merits of the case, incurring the costs of doing so. A default judgment gives the plaintiff something of a windfall by sparing her from litigating the merits of her claim because of her opponent's failure to respond; vacating the default judgment merely restores the parties to an even footing in the litigation.

*Id.*

In the instant case, there is no apparent prejudice to Mr. Hunter if the default were to be set aside. This case was filed only a few months ago in September 2008, *see* Docket No. 1 (complaint) -- *i.e.*, at most, there has been only a delay of a few months because of TBDC's failure to respond. A delay of this length likely will not hinder Mr. Hunter from pursuing his claim.

In his opposition brief, Mr. Hunter argues that he has been prejudiced because the delay has given TBDC an "extended period of time to hide its assets." Opp'n at 3. But at this juncture this is only speculation. Mr. Hunter has provided no evidence suggesting that TBDC has been doing such.

Mr. Hunter argues still that setting aside the default would be prejudicial to him because it would force him to litigate the case "without some guarantee that there will be money to collect at the end of the day." Opp'n at 3. But, as noted above, the Ninth Circuit has expressly held that being forced to litigate on the merits cannot be considered prejudicial.

E. <u>Conditions on Setting Aside Default</u>

Finally, Mr. Hunter contends that, if the Court is inclined to set aside the default, then it should do so only upon certain conditions: (1) requiring TBDC to post a bond in the amount of $116,927.88 (1.2 times the judgment sought); (2) requiring TBDC to pay Mr. Hunter's attorney's fees related to his pursuit of default and default judgment and his opposition to TBDC's motion to set aside the default (totaling $4,384.50), *see* Simon Decl. ¶ 7 (stating that he has spent 11.1 hours at an hourly rate of $395); and (3) allowing Mr. Hunter to file an amended complaint (in particular, so that he can add Wade Summers as an individual to the suit).

The Court does have the authority to impose at least certain conditions for the setting aside of a default. In *Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec*, 854

F.2d 1538 (9th Cir. 1988), the Ninth Circuit expressly addressed the issue of conditioning, stating as follows:

> In discussing the conditioning of defaults, we have noted that other circuits have held that Fed. R. Civ. P. 60(b) allows district courts to impose such conditions on relief from judgment of default. .
>
> By conditioning the setting aside of a default, any prejudice suffered by the non-defaulting party as a result of the default and the subsequent reopening of the litigation can be rectified. According to Wright, Miller & Kane, the most common type of prejudice is the additional expense caused by the delay, the hearing on the Rule 55(c) motion, and the introduction of new issues. Courts have eased these burdens by requiring the defaulting party to provide a bond to pay costs, to pay court costs, or to cover the expenses of the appeal. The use of imposing conditions can serve to "promote the positive purposes of the default procedures without subjecting either litigant to their drastic consequences."
>
> In *Thorpe*, it was noted that the "philosophy of modern federal procedure favors trials on the merits, and default judgments should generally be set aside where the moving party acts with reasonable promptness, alleges a meritorious defense to the action, and where the default has not been willful." Moreover, reasonable conditions may be imposed in granting a motion to vacate a default judgment. The condition most commonly imposed is that the defendant reimburse the plaintiff for costs incurred because of the default. In some cases, it may also be appropriate for the defendant to be required to post bond to secure the amount of the default judgment pending a trial on the merits.
>
> By setting aside the default with conditions, the district court judge in the instant case was attempting to facilitate discovery and was protecting the non-defaulting party by not requiring the plaintiff to pay for its costs. We find this behavior appropriate and not an abuse of discretion. Accordingly, we now hold that it is appropriate to condition setting aside a default upon the payment of a sanction.

*Id.* at 1546-47; *see also* 55 Moore's Fed. Prac. -- Civ. § 55.70 ("A court may use [its] inherent power [to impose reasonable conditions in order to avoid undue prejudice to the nondefaulting party] to require a party to post security for payment of all or part of an eventual judgment. Another condition a court may impose is the payment of reasonable attorney's fees and costs incurred by the opposing party because of the default.").

Of course, that the Court has the authority to condition does not necessarily mean that it must do so. Each of the conditions sought by Mr. Hunter is addressed below.

8

1. Attorney's Fees

The first condition sought by Mr. Hunter is a requirement that TBDC pay the attorney's fees related to his pursuit of default and default judgment and his opposition to TBDC's motion to set aside the default. As noted above, counsel for Mr. Hunter has spent at least 11.1 hours, at an hourly rate of $395, on these matters, for a total of $4,384.50. *See* Simon Decl. ¶ 7.

The Court shall not condition the setting aside of the default upon payment of any attorney's fees. Even at the time that Mr. Hunter sought entry of default, it was clear that TBDC was trying to settle the case (offering to pay the principal of $83,000) rather than choosing not to participate in the case at all. *See* Simon Reply, Ex. A (e-mail, dated 9/25/08). TBDC's counsel sought an extension which Mr. Hunter's counsel denied. Mr. Hunter pursued an entry of default without exhausting efforts to either settle or get TBDC to respond. More importantly, Mr. Hunter's decision to seek a default judgment, in spite of TBDC's attempt to settle the case, was ill advised, particularly given the Ninth Circuit case law cited above which clearly favors litigating cases on their merits and setting aside entries of default. Mr. Hunter's opposition to the motion to set aside the default and for default judgment bordered on frivolous, in light of applicable Ninth Circuit law. The time incurred in opposing the motion to set aside the default, presumably constituting the bulk of attorney time claimed herein, was an expense that should never have been undertaken. While Mr. Hunter has a slightly stronger claim for time spent on the initial entry of default, the time spent on this largely ministerial task was not shown to be anything more than *de minimus*.

2. Bond

The second condition sought by Mr. Hunter is a requirement that TBDC post "a bond in the amount of 1.2 times the amount of the judgment sought by Hunter (or $116,927.88)." Opp'n at 4. While the Ninth Circuit has stated that, "[i]n some cases, it may . . . be appropriate for the defendant to be required to post bond to secure the amount of the default judgment pending a trial on the merits," *Nilsson*, 854 F.2d at 1546, Mr. Hunter has not explained what circumstances there are in this case that would make a bond appropriate. For example, Mr. Hunter has not demonstrated that TBDC would not be financially able to pay a judgment. To the extent Mr. Hunter suggests that a bond is necessary because of the danger that TBDC will dissipate its assets, there is no evidence of

9

such, as stated above. Moreover, there would be the same problem of dissipation of assets regardless of whether there were a default judgment or not -- *i.e.*, there is no causal relationship between the bond (as a condition of setting aside the default) and the default judgment sought.

### 3. Amended Complaint

Finally, Mr. Hunter asks that the setting aside of default be conditioned on his ability to file an amended complaint. While there does not appear to be any authority which contemplates an amendment as an appropriate condition, as a practical matter the Court finds that an amendment is appropriate. Mr. Hunter seeks to amend because of the defense asserted by TBDC in its papers -- *i.e.*, that it is Wade Summers, and not TBDC, who is obligated to pay the $100,000 loan. Such an amendment would clearly be proper under Federal Rule of Civil Procedure 15(a)(2), and, in any event, TBDC has stated on the record that it does not oppose the filing of an amended complaint. Accordingly, the Court gives Mr. Hunter leave to file an amended complaint. Such complaint shall be filed and served no later than February 12, 2009.

## III. CONCLUSION

For the foregoing reasons, TBDC's motion to set aside the default is granted. Because the Court is granting TBDC's motion, Mr. Hunter's motion for default judgment is rendered moot.

This order disposes of Docket Nos. 10 and 23.

IT IS SO ORDERED.

Dated: January 29, 2009

_____
EDWARD M. CHEN
United States Magistrate Judge